IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
IN AND FOR SARASOTA COUNTY, FLORIDA

CASE NO. 2013 CA 001299 NC

JACK LE FROCK, M.D.,

      Plaintiff,

vs.

WALGREEN CO., a foreign
corporation doing business in Florida,

      Defendant.
_____/

**DEPOSITION OF**

**KATHRYN HARRIS**

TAKEN BY:  THE PLAINTIFF HEREIN

PLACE:      46 North Washington Boulevard
           Suite 15
           Sarasota, Florida  34236

BEFORE:     Laurie J. Cheffy
           Court Reporter
           Notary Public
           State of Florida at Large

DATE:       September 29, 2014
           Commencing at 9:45 a.m.

APPEARANCES:

        LAWRENCE KLEPETKO, Esquire
        46 North Washington Boulevard
        Sarasota, Florida  34236
          On Behalf of the Plaintiff

        MARTIN D. STERN, Esquire
        Hinshaw & Culbertson, LLP
        One East Broward Boulevard
        Suite 1010
        Ft. Lauderdale, Florida  33301-1804
          On Behalf of the Defendant

CERTIFIED COPY

DEFENDANT'S
EXHIBIT

3

24

1        Q.     Has there been any restriction imposed by

2  Walgreen Company for filling prescriptions issued by

3  Dr. Le Frock?

4               MR. STERN:  Form.

5               THE WITNESS:  No.  Every patient's

6          prescription is looked at on a patient-by-

7          patient basis.

8  BY MR. KLEPETKO:

9        Q.     There is no central information

10  restricting a patient of Dr. Le Frock's to receiving

11  prescription drugs simply because they are a patient of

12  Dr. Le Frock?

13        A.     No.

14        Q.     Is there an approved list of medical

15  practitioners maintained by Walgreen, Walgreen Company,

16  for doctors who issue prescriptions?

17        A.     No.

18        Q.     Is there any coding in a computer system

19  operated by Walgreen Company for approving or

20  disapproving specific medical practitioners who can

21  write prescriptions?

22        A.     No.

23        Q.     Okay.  Has Walgreens refused to fill

24  prescriptions issued by Dr. Le Frock?

25        A.     Yes.

1       though you used those words, and Miss Harris is

2       here for this deposition.  I'm not going to

3       continue to engage you in this conversation.

4               MR. KLEPETKO:  Okay.  We can then keep

5       going.

6   BY MR. KLEPETKO:

7       Q.    Mrs. Harris, since litigation against

8   Walgreen Company was begun by the Plaintiff in this

9   case, Dr. Le Frock, has Walgreen Company made any sales

10  of prescription medicines or prescriptions written by

11  Dr. Le Frock?

12              MR. STERN:  Object to the form of the

13      question.  It's outside the scope of your

14      deposition notice.  I'll let her answer to the

15      best of her ability but note my objection to

16      the record.

17              THE WITNESS:  I mean, I don't know that I

18      could answer that.  We have 8,000 stores.  He

19      could have -- His patients could fill his

20      prescriptions at any one of those stores and I

21      wouldn't know.

22  BY MR. KLEPETKO:

23      Q.    If there is a decision made by Walgreen

24  Company not to fill a particular prescription, who

25  makes that decision?

```
 1          A.      The pharmacist.
 2          Q.      Individual pharmacist?
 3          A.      Individual pharmacist.
 4          Q.      Are there any particular policies issued
 5   by Walgreen Company for filling prescriptions presented
 6   by patients of a particular medical doctor?
 7          A.      Not of a particular medical doctor.
 8          Q.      You don't believe that there is any
 9   system in place, including on a computer, for Walgreen
10   Company that identifies particular doctors as to being
11   approved or not approved for issuing or for filling
12   prescriptions?
13          A.      Walgreens has a policy in dispensing pain
14   medication, but it is not particular to a doctor or
15   doctors.  It's particular to controlled substances.
16          Q.      It only pertains to pain medications?
17          A.      Well, the Walgreens -- not Walgreens, but
18   the pharmacy oath is that we would dispense in good
19   faith in every prescription that we're dispensing.
20          Q.      Have there been discussions between
21   Walgreen Company and either Dr. Le Frock or somebody in
22   Dr. Le Frock's office about a specific prescription for
23   a specific patient?
24          A.      Wait.  Can you repeat that?
25          Q.      Have there been any discussions that
```

1      A.    I did not use the term "pill mill." You

2  did.

3      Q.    I'm sorry.  Are you familiar with that

4  term?

5      A.    I am.

6      Q.    What do you understand it to mean?

7      A.    I understand a pill mill to be a

8  physician that takes a cash payment for prescriptions

9  and writes what the patients want.

10     Q.    Would that be without reference to

11 appropriateness for a specific patient's medical

12 diagnosis?

13     A.    I would say it could be.

14     Q.    Does insurance coverage have anything to

15 do with pill mill?

16     A.    Most pill mills don't accept insurance.

17 They're cash clinics.

18     Q.    Is the existence or nonexistence of

19 medical insurance coverage a factor for Walgreen

20 Company in filling a specific doctor's medical

21 prescription or not?

22     A.    It's a red flag.

23     Q.    Is there a red flag notation made with

24 reference to any specific doctor regarding that

25 doctor's prescriptions as far as Walgreen Company is

```
1    company somewhere?
2         A.    It's a -- Each -- Well, Walgreens doesn't
3    tell us to fill or not to fill for anyone because we're
4    individually licensed, so we look at every prescription
5    on a patient-by-patient basis.  So they don't have to
6    tell us to do that.  That's what you do as a
7    pharmacist.  And they don't instruct us not to fill
8    because, again, we operate under our own license.
9         Q.    Would it be accurate then that Walgreen
10   Company goes forward respecting individual pharmacists'
11   professional discretion as licensed pharmacists
12   regarding a decision to fill or not fill a particular
13   prescription?
14        A.    Yes.
15        Q.    Okay.  But that's not in any written
16   policy that you've ever been made aware of?
17        A.    Wait.  So restate what you're asking me.
18   I'm sorry.
19        Q.    Okay.  That is the policy you understand.
20   Have you ever seen that policy in writing?
21        A.    Which policy again?  I'm sorry.  Can you
22   restate the whole question.
23        Q.    About the individual pharmacist's
24   personal discretion regarding the use of his or her
25   pharmacy license to fill or not fill prescriptions.
```

**ASSOCIATED COURT REPORTING OF SOUTHWEST FLORIDA**
**(941) 951-1560**

1        Q.     Thank you.

2        (EXHIBIT 4 WAS MARKED FOR IDENTIFICATION)

3  BY MR. KLEPETKO:

4        Q.     This would be the affidavit of Thomas

5  O'Callaghan.  Do you have that one in front of you?

6        A.     I do.

7        Q.     Okay.  Take a moment if you would to

8  review it and tell me when you're ready.

9        A.     Okay.

10       Q.     Other than the affidavit that is in front

11  of you now, do you have any information about this

12  conversational exchange between Thomas O'Callaghan and

13  the pharmacy manager at Walgreen Company for its store

14  location in -- Sorry.  It does not indicate a specific

15  location.  Do you know a pharmacy manager by the name

16  of Isaak Smith?

17       A.     I do not know Isaak.

18       Q.     Okay.  Do you know whether Walgreen

19  Company has ever employed a pharmacy manager by the

20  name of Isaak Smith?

21       A.     I don't know that.

22       Q.     There's a statement in here that Dr. Le

23  Frock is under a criminal investigation.  Do you know

24  about any criminal investigation involving Dr. Jack Le

25  Frock?

1  reviewing prescriptions, we may not feel comfortable

2  filling a prescription if we feel that that patient is

3  possibly being investigated or defrauding narcotics.

4          Q.     Would that cause action by Walgreen

5  Company to red-flag the doctor identified with that

6  patient?

7          A.     No.  We don't red-flag doctors.  We red-

8  flag situations patient by patient.  So it's the

9  pharmacist's discretion at that time to fill the

10  prescription.

11          Q.     Okay.  From your prior testimony, would

12  you agree that in recent times, there have been medical

13  doctors who have abused prescription-writing privileges

14  with reference to certain pain medications?

15                  MR. STERN:  Form.

16                  THE WITNESS:  Wait.  Restate the

17          question?

18  BY MR. KLEPETKO:

19          Q.     That there have been doctors identified

20  who have abused prescriptions and prescription writing.

21          A.     I don't --

22                  MR. STERN:  Form.

23                  THE WITNESS:  I'm not sure that I know of

24          a specific doctor that has abused it.  I mean,

25          there was definitely an epidemic in the state

1    reference to his medical practice?

2         A.    I'm sorry.  I was rereading this.  Can

3    you restate that?

4         Q.    Sure.  With reference to a licensed

5    medical doctor, is a comment that the doctor should be

6    in the ground 10 years ago, is that a bad reference to

7    his medical practice?

8         A.    I don't know that it makes any reference

9    to his medical practice.  Maybe this person is just

10   surprised that he's still alive.  Maybe they knew he

11   retired when he was 60 and is shocked that he's still

12   here.  I don't know.  I can't speak to this person's

13   frame of mind.

14        Q.    Do you think there's any appropriate

15   circumstance that another human being should have been

16   in the ground 10 years ago?

17             MR. STERN:  Form.

18             THE WITNESS:  No.

19   BY MR. KLEPETKO:

20        Q.    Okay.  Thank you.  Now, there's also

21   reference here that Dr. Le Frock is running a pill

22   mill.  Today, does Walgreen Company have any basis to

23   say that Dr. Le Frock then was running a pill mill or

24   since then has run a pill mill?

25             A.    No.

ASSOCIATED COURT REPORTING OF SOUTHWEST FLORIDA
(941) 951-1560

123

1          A.     Correct.

2          Q.     Okay.  Both of these affidavits refer to

3    Dr. Le Frock being on a list and, for that reason, the

4    pharmacist would not fill prescriptions issued by Dr.

5    Le Frock.  Do you see that?

6          A.     I do see that.

7          Q.     That's obviously inconsistent with your

8    prior testimony to the effect that Walgreen Company

9    does not maintain any such list.  Would that be

10   accurate?

11         A.     That would be accurate.  We do not have a

12   list.

13         Q.     Okay.  Can you offer any explanation

14   today as to why a pharmacist at Walgreen would make a

15   statement to Dr. Le Frock and to Cindy Dorman that

16   there was such a list?

17         A.     Well, in reading the depositions of Cindy

18   and Dr. Le Frock, Dr. Le Frock admits to working at a

19   pill mill clinic in Clearwater for some time when he

20   first came back.  That can make a name for him, working

21   at a pill mill.  He admits to that.

22                So when he's involved in that activity at

23   that location and other pharmacists know that that is a

24   pill mill and they're seeing prescriptions from Dr. Le

25   Frock out of that, that would cause all pharmacists to

1    have some -- to be trepidacious in filling

2    prescriptions from him.  Even though he moved from that

3    to open his own pain management clinic, it still leaves

4    you to be a little concerned that that behavior

5    wouldn't follow him.

6              And in Cindy's deposition, she also

7    states that approximately over 200 of their patients

8    were turned in for doctor shopping.  That speaks to

9    their clientele.

10             We also use E-FORCSE, which is the

11   Prescription Drug Monitoring Program, and we're able to

12   see the patients and the possible abuse of medications,

13   certainly the trend of doctor shopping and the

14   medications.

15             So, you know, you're asking if these

16   pharmacists had reason to be concerned for filling Dr.

17   Le Frock's prescriptions?  I think that they do just in

18   the confirmation of Cindy and Dr. Le Frock themselves

19   in saying that they had patients that were undesirable

20   that they needed to discharge from the practice and

21   that, you know, it takes time to rebuild your

22   reputation when you've been in a bad situation.  And I

23   think, you know, rebuilding that reputation is what's

24   occurring, but there is reason to be concerned for

25   filling Dr. Le Frock's prescriptions having been

1   associated with a former pill mill and the clientele

2   that he himself admits to having.

3            Many of the depositions talked about the

4   abuse and how verbally abusive these patients can be to

5   pharmacists.   Thomas O'Callaghan spoke intently about

6   that in his deposition, having been a former pharmacist

7   himself.   Many of the depositions that I've read for

8   these patients have admitted to substance abuse, have

9   criminal records of possession of illegal medications.

10  So these patients at times can be very verbally abusive

11  to a pharmacist when confronted with not filling their

12  prescriptions.

13           There's no implication to Dr. Le Frock.

14  I feel that in these situations, these patients were

15  refused prescriptions due to the clinical review and

16  professional judgment of the pharmacist and it was

17  based on the patient, not on the physician.

18           Q.      Okay.   Thank you for that answer.   I want

19  to focus on the list.   Again, would this history that

20  you describe be a basis for making up a list of

21  unapproved doctors?

22           A.      We don't have a list of unapproved

23  doctors.   That's not Walgreen's policy and we don't

24  keep a list.   There are at times a cash list, like a

25  cash clinic.   If a cash clinic -- In the area, we may

1    the affidavits that the patients have made that

2    Walgreens pharmacists, although not named, have made

3    defamatory statements.  That's what you're asking me,

4    if those were based on sound information.

5          Q.    Yes.

6          A.    So I can't speak for the pharmacists that

7    made those statements.  I can't even figure out which

8    pharmacist made those statements to talk to them about

9    it.  And as far as the information, the only

10   information that Walgreens has is that which Dr. Le

11   Frock and Cindy have given in their depositions about

12   discharging patients from the practice and the previous

13   involvement he had with a pill mill up there.  Other

14   than those statements, I don't have anything.

15         Q.    And as to those prior statements, your

16   testimony was you have no information about the

17   statements themselves other than what you saw in front

18   of you as the statements.

19         A.    Correct.

20         Q.    That's correct?  Okay.  So you have

21   nothing else besides what you've read in depositions

22   and what may have been said in conversation with Mr.

23   Stern and his law firm or with corporate counsel for

24   Walgreen.  Is that your testimony today?

25         A.    Correct.

1          comments?

2                    MR. KLEPETKO:  Yes, ma'am.

3                    THE WITNESS:  And that's what I'm saying,

4          I can't speak to their intentions.  Maybe they

5          truly felt that because he had worked at a

6          previous pill mill that he was still involved

7          in that behavior and they were trying to help

8          the patient get to a place where they were

9          being treated by an appropriate physician.  I

10         don't know.  I can't speak to the intent of why

11         they made those comments or what their thought

12         process was behind making them.  We can't even

13         talk to the people who made those comments to

14         ask them.

15  BY MR. KLEPETKO:

16         Q.    Yes, ma'am.  And again, your comment or

17  your response is with reference to these other people.

18  Could you please make a response based on what you know

19  today without reference to these other people?

20         A.    The things in the affidavits that were

21  said were not nice.

22         Q.    Okay.  And in fact, the one made with

23  reference that Dr. Le Frock should have been in his

24  grave 10 years ago was downright nasty, wasn't it?

25                   MR. STERN:  Form.

1          THE WITNESS:  Again, it's -- We're

2     reading it and it's not in -- It's out of

3     context.  What if that person was saying it

4     jokingly, Oh -- We don't know the whole context

5     in which that statement was made.  Maybe the

6     person was like, Oh, I thought he retired when

7     he was 60, years ago; I thought he'd be dead by

8     now.  That doesn't mean it's a nasty comment.

9     We're taking it out of context.  There's no

10     tone.  So I don't feel comfortable saying it's

11     a nasty statement because I don't know the

12     context in which it was said or the tone in

13     which it was said.

14  BY MR. KLEPETKO:

15          Q.     Okay.  With reference to any other human

16  being should have been dead 10 years ago, what

17  circumstance would you have in mind that that would be

18  at all appropriate?

19          A.     Again, it speaks to the context.  What if

20  there was a cancer survivor and you said, Oh, my gosh,

21  they should have been dead 10 years ago; they're still

22  alive.  That doesn't make it a nasty statement.

23          I can't -- I feel like you're leading me

24  to say that this is a nasty statement and it should

25  never have been said, but again, I don't know the

ASSOCIATED COURT REPORTING OF SOUTHWEST FLORIDA
(941) 951-1560

1        A.     Again, I think it speaks to the intent of

2   the pharmacist.  If the pharmacist thought he was still

3   associated with the pill mill that he once worked for,

4   maybe they thought they were doing a public service to

5   the patient.  I'm not sure.  It's complete speculation

6   is what you're asking me.

7        Q.     Okay.  Suppose this patient had presented

8   himself or herself to you.  Could you ever imagine

9   yourself with your knowledge of Dr. Le Frock making any

10   such statement as those that you have reviewed today?

11        A.     No.  The statement that we make when we

12   don't fill a prescription is that Walgreens is working

13   hard to ensure the safety of dispensing controlled

14   medications.  This did not pass my clinical view and in

15   my professional judgment does not meet the requirements

16   set forth by Walgreens to dispense it.  Therefore, it

17   cannot be filled at a Walgreens at this location or any

18   Walgreens for the next 90 days.  That's what we tell

19   our patients.  So that's what I would have said if I

20   were not filling his prescription.

21        Q.     And you would have made none of these

22   other statements about should have been dead 10 years

23   ago, not a legitimate doctor, under criminal

24   investigation or any of these others?

25        A.     No.

1      Q.     Okay.  What evidence do you have today

2  that in making any of these statements that have been

3  reviewed today in this deposition that Walgreen Company

4  is not guilty of any intentional misconduct or gross

5  conduct?

6      A.     What evidence do I have?

7      Q.     Yes.

8          MR. STERN:  Form.

9          THE WITNESS:  Well, I mean, the

10         affidavits that you have don't give us specific

11         people to even truly investigate with who said

12         what, and our policy is to use the statement

13         that I had just told you when declining a

14         prescription.

15  BY MR. KLEPETKO:

16     Q.     Okay.  So with that statement, would it

17  be accurate that you have no evidence that there is

18  intentional misconduct or gross conduct on the part of

19  Walgreen Company?

20     A.     I don't think we have sufficient

21  information in the affidavits to talk to the alleged

22  person who made these comments.

23     Q.     Let's move on to item number 5 in the

24  affirmative defenses.  Are there any guidelines issued

25  by Walgreen Company to its pharmacists or any other

Case 8:13-cv-02196-EAK-TBM   Document 42-3   Filed 11/03/14   Page 18 of 19 PageID 478

1    question.

2            Q.     Why not?

3            A.     Because I think again it's asking my

4    opinion, and my opinion isn't what really matters.  I

5    can answer to facts and truths, but my opinion is not

6    -- I just don't think it's for me to decide.

7            Q.     Well, to be sure, there is a question

8    ultimately of a jury, but is there anything about any

9    of these statements that were talked about that was

10   free from malice?

11                  MR. STERN:  Form.  Object.  I'm going to

12              instruct her not to answer that.  Unless you

13              give her a proper definition that is a legal

14              definition of "malice," it's improper to ask

15              her that question.

16                  MR. KLEPETKO:  Bad intent would be a

17              definition.

18                  THE WITNESS:  And I think that goes back

19              to my previous statement that I can't speak to

20              the intent of the pharmacists that made those

21              statements or technicians or store managers.

22              They weren't even defined in those affidavits

23              exactly who they spoke with.  I cannot speak to

24              the intent of those statements or why they were

25              made.

1          I don't know.  At one time, that was a factual

2      statement.  He was part of a pill mill.  In his

3      own deposition, he stated that.

4  BY MR. KLEPETKO:

5          Q.    It was your prior testimony that your

6  knowledge about Dr. Le Frock's work at the Tampa pain

7  clinic did not reflect any knowledge of his own

8  relationships with patients in that employment as far

9  as the propriety of his prescriptions were concerned.

10  Isn't that correct?

11          A.    No, that's not correct.  My previous

12  testimony said I could not testify to whether or not he

13  was part of that illegal activity because I didn't have

14  profiles from when he was filling patients at that pill

15  mill.  So I don't know his prescribing habits during

16  that time.  I did testify that his Sarasota practice

17  which I visited was definitely not a pill mill and was

18  within good standings.

19          R. KLEPETKO:  Could we take a brief

20      recess?

21      (RECESS FROM 4:05 TO 4:10 P.M.)

22  BY MR. KLEPETKO:

23          Q.    Mrs. Harris, you testified previously

24  about Dr. Le Frock's qualifications for practicing pain

25  medicine or you stated testimony, I believe, to the