```
                                                    Page 1

              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
                     Tampa Division

  JACK LEFROCK, M.D.,

                Plaintiff,

  vs.                               Case No.
                                    8:13-cv-02196-EAK
  WALGREEN CO., a foreign corporation
  doing business in Florida,
                Defendants.
  _ _ _ _ _ _ _ _ _ _ _ _ _ _ /


       DEPOSITION OF:  THOMAS O'CALLAGHAN

       DATE:           June 25, 2014

       TIME:           1:16 p.m. to 4:08 p.m.

       PLACE:          Michael Musetta & Associates, Inc.
                       146 2nd Street North, Suite 310
                       St. Petersburg, Florida

       PURSUANT TO:    Notice by counsel for
                       Defendant for purposes of
                       discovery, use at trial
                       or such other purposes
                       as are permitted under
                       the Federal Rules
                       of Civil Procedure

       BEFORE:         LISA A. SIMONS-CLARK, RMR, CRR
                       Notary Public, State of
                       Florida at Large

                       Pages 1 to 109


  Job No. CS1864036
```

DEFENDANT'S EXHIBIT 10

Page 13

1  dropped.  That was -- that was a trying time, to tell
2  you the truth.  I mean, how do you -- you know, my
3  friends see that you're arrested and charged with child
4  abuse in the paper, and that's shocking to everybody,
5  myself included.
6        Q.   Were you ever on probation?
7        A.   I think I was on probation for the -- the
8  oxycodone incident.
9        Q.   So were you convicted for the oxycodone
10 incident?
11       A.   They -- they -- they gave me the choice.  They
12 said they'd withhold adjudication if I pleaded guilty;
13 but I should have fought it, to tell you the truth,
14 since it was my own prescription, but I just didn't
15 have $10,000 hanging around.  So I just said, Sure, if
16 we can withhold adjudication, do this, do that, and I
17 walk away and don't spend a second, you know, in jail
18 and have nothing going forward, I was okay with -- not
19 okay with that, but --
20       Q.   What did you actually plead guilty to?  What
21 was the charge?
22       A.   I think it was possession of a controlled
23 substance.  It was my own controlled substance.
24       Q.   When did that occur?  Between what dates?
25       A.   Wow.

Page 14

1  Q. You don't have to be exact, just pretty close.
2  A. Five years ago.
3  Q. While you were under the care of Dr. LeFrock?
4  A. Four years. Five years. I would say yes,
5  so -- that's a good -- that's a good -- I don't
6  really -- I know we were on oxy -- I was on oxycodone
7  at one point with you, Jack, but I won't defer to you.
8  I'm going to say yes, I was with him since, you know,
9  I'm going to stick with the five-year timeline.
10 Q. Thank you. Have you ever abused prescription
11 pain medication?
12 A. To my thinking, no. To mine, no.
13 Q. Do you have any medical licenses?
14 A. I have my -- my Pharm.D., which is my license,
15 but currently I'm -- the board and I are having a
16 little tete-a-tete over fines and stuff like that over
17 the oxycodone incident, which is --
18 Q. What is your background and education? Where
19 did you go to college?
20 A. I went to USF. I have my BS in biology from
21 USF. I have my AA from St. Pete College it is now. I
22 have my Pharm.D. from Nova Southeastern University.
23 Q. What is a Pharm.D.?
24 A. It's a doctor of pharmacy.
25 Q. So you are a doctor of pharmacy graduate --

Page 20

1   Q.   She's holding up the process?

2   A.   Her vote, yes, and --

3   Q.   Why do you suppose that is?

4   A.   From doing some research on her, her son has

5   died from an oxycodone overdose.  So not my -- you

6   know, I think she's mixing a little bit of her grief

7   with why the 5 people vote yes to give him his license

8   back and the sixth person says no, and that's why I

9   looked into it, so --

10  Q.   Can we agree that the Florida Board of

11  Pharmacy did revoke your license?

12  A.   Yes, we can agree to that.

13  Q.   And as it stands today, June of 2014, the

14  Florida Board of Pharmacy has presently refused to

15  reinstate your license?

16  A.   To practice pharmacy, correct, but I can still

17  do other things.  As I said, I'm currently consulting

18  on other projects with, you know, other people involved

19  and things like that.

20  Q.   Understood, and thank you for clarifying that.

21  And just so I understand the difference, what type of

22  projects are you working on so that you're not in

23  violation of The Board of Pharmacy rules?

24  A.   It's not really -- I wouldn't say it's a full

25  blown.  It's more of we all get together once a year,

Page 30

1      the days of the 600, 700 are gone.
2           Q.   And as a pharmacist, what was your
3      responsibility in trying to curb or prevent this type
4      of abuse?
5           A.   We were basically only told to call, verify
6      the prescription, make sure that, you know, the patient
7      was on it for a verified thing and verify and document
8      that on the prescription.  That was --
9           Q.   Who told you that those were the instructions
10     for you to follow?
11          A.   That's what you -- something you learned in
12     pharmacy school and law.
13          Q.   But as a pharmacist, you have the legal right
14     to refuse to fill any prescription.  You agree?
15          A.   Yes.  That's part of the --
16          Q.   So at any point in time, when presented with a
17     prescription, as a pharmacist you can use your
18     professional judgment to refuse to fill any
19     prescription order written by any doctor at any time?
20          A.   Correct.  And they could just go up the street
21     and get it filled from somebody else.
22          Q.   Right.
23          A.   But at the same time, there are -- there's
24     also, you know, business to be done.  I mean, there's
25     people -- there's lawyers that have to represent, you

```
                                                    Page 42
 1        Q.   -- did you ever receive prescriptions for pain
 2   medications such as OxyContin, oxycodone where you said
 3   to the customer, I will not fill this prescription?
 4        A.   Yes.
 5        Q.   You did that?
 6        A.   A hundred percent.  No doubt in my mind.
 7        Q.   What were some of the reasons you chose to do
 8   that?
 9        A.   Track marks would be -- track marks that I.V.
10   drug users have, you know, where you can clearly see,
11   you know, there's just a lot of physical signs of abuse
12   where the person weighed, like, 95 pounds and was
13   getting way too many -- it goes on and on; and somebody
14   else wanting to pay for their prescription, calling up
15   and saying, Hey, put it on my credit card.  No, I'm not
16   going to do that.  Thanks.  Drive through, you know.
17             There's -- there's -- I -- probably over a
18   hundred times and under a thousand times I turned away
19   prescriptions.  More closer to a thousand times I
20   turned away prescriptions.
21        Q.   Even though there was a valid prescription
22   presented to you --
23        A.   Uh-huh.  (Indicates affirmatively).  Yeah.
24        Q.   -- for the pain medication?
25        A.   Yeah.
```

Page 43

1   Q.   Did you use your professional judgment in
2   making that determination?
3   A.   That's exactly what I used.  You know, that's
4   when the law kicks in as well.  If somebody from
5   Sarasota brings a prescription up to St. Pete and they
6   live in Orlando, it's a little fishy.
7        We have what's called the three legs of the
8   pyramid.  We like to keep those as close as possible:
9   The prescriber, the prescribee, and, you know, the
10  medication, and we want them as close.  Ultimately the
11  person, the prescriber, and the place they were getting
12  them filled would all be in the same city.  St. Pete is
13  where I get all my medications filled, so --
14  Q.   Were there times when you were presented with
15  a prescription for pain medication such as OxyContin or
16  oxycodone and you looked at the customer and, just by
17  looking at the customer, you said, in your professional
18  judgment, I better not fill this, because if I do, it
19  could kill the person or somebody else could get killed
20  if they're driving on the road under -- under this --
21  A.   I wouldn't make a snap judgment.  It would
22  never be -- but there was times where people would come
23  in staggering.  It was almost like serving another
24  person a drink at a bar.  You almost become the
25  bartender there.  You're cut off.  You don't really

44

1  need these.  You're over the edge.  You're --
2      Q.   How does a, in your experience, customer --
3  let me strike that.
4           How did these customers generally respond to
5  you when you refused to fill their prescription for a
6  pain medication when you literally cut them off?
7      A.   Oh, you're just an asshole.  They'll fill it
8  up the street.
9      Q.   They would say that to you?
10     A.   Have a good time.  Oh, that was the most
11 common response.  I got that probably 90 percent.
12 They'll fill it up the street.
13     Q.   The customer would actually say that to you as
14 a pharmacist?
15     A.   Say that straight to my face, and I'm like,
16 Have a nice time.  Go ahead.
17     Q.   Why do you suppose that the customer was
18 getting angry from a practical standpoint?
19     A.   Because they -- people want it right away.  If
20 you cut them off at a -- you know, from what they're
21 getting at a bar, they don't want to go to a different
22 bar.  If you cut them off at the pharmacy, they don't
23 want to go to a different pharmacy.  Even though they
24 say they can, they don't want to, so --
25     Q.   And they want it quickly?

Page 63

1  say, Linda, I'm in the area. Hey, you know, what's up?
2  Have you got these? And she'd go, Let me check. Well,
3  and she would fill them if she had them.
4      Q.  Today, June of 2014, where do you get your
5  pain medication prescriptions filled?
6      A.  Publix.
7      Q.  Exclusively?
8      A.  I get my other -- my morphines filled at
9  Costco. They're the only -- for some reason, like I
10 mentioned earlier, A, B, and C, for some reason, Costco
11 is the only one that can get the morphines in, so I go
12 there.
13     Q.  I have a copy of your affidavit in front of
14 me, and it represents that on May 4th, 2012, you tried
15 to fill a prescription at the Walgreens located at 49th
16 Street and 78th Avenue in Pinellas Park, Florida. Does
17 that sound accurate?
18     A.  That sounds accurate, correct.
19     Q.  So that's the incident that we were talking
20 about?
21     A.  Yes, 5/4. Okay.
22     Q.  Tell me what happened, please.
23     A.  I brought my prescriptions in, and there's an
24 elderly lady that usually works sometimes during the
25 day, and I remembered her name back then, I don't

Page 64

anymore. Names, as I get older, names tend to go away; but I saw she was working, and I said, Oh, good, Doris -- we'll call her Doris -- is working.

I handed them to her because she had filled them, you know, a few times in the past for me.

Q. You're talking about the pain medications --

A. Yeah.

Q. -- that we talked about?

A. Uh-huh. (Indicates affirmatively). And handed her the prescriptions.

Q. These were written by Dr. LeFrock?

A. Correct. And then all of a sudden I hear, No, we're not going to fill those. And it wasn't from her. I said, Wow, that's kind of weird. So then I said, Okay. I got them back, and a gentleman, a bald gentleman, came out through the -- through the door; and the weird part is is the door was here, and the picture of, like, the pharmacy manager was right there, and I could see it was the same exact person.

So I was like, Hey, that's you in the picture. So I said, What's up? You guys don't want to fill these, or what's going on? And then he just proceeded to go off, and I'm like -- he said -- he said what -- he said, That doctor is running a pill mill; that doctor is under criminal investigation. We're not

Page 73

1  point I knew he was a lost cause.  I said this guy
2  is --
3      Q.   So there was no specific reference to
4  Dr. LeFrock running a pill mill.  Fair enough?
5      A.   No specific, but it was generalized, taken as,
6  We're not going to fill them for pill mills; we're not
7  going to fill them for Dr. LeFrock.
8      Q.   And you didn't find the pill mill statement to
9  be significant enough or at least harmful enough that
10 you had to put it in this affidavit?
11     A.   Not at that point, no.
12     Q.   Why didn't you think the pill mill statement
13 was a big deal?
14     A.   The term is just thrown around.  You must have
15 said it probably a hundred times today.  The term is
16 thrown around just too randomly to have an actual
17 definite -- definition of what a pill mill actually is.
18 There's no real -- you can't look up the definition of
19 pill mill.  What is it?  It's --
20     Q.   Almost where people hear it -- we're hearing
21 it so much in 2011, 2012 that customers, patients,
22 pharmacists all just pretty much ignored the reference
23 to "pill mills"?
24     A.   You know, is the guy you see a pill mill?  Is
25 this?  You know, is that a pill mill?  You know, it's

1  just -- it's almost become I want -- I want a Coke as
2  opposed to even though they have Pepsi.
3      Q.  So for this reason you didn't think it was
4  really significant enough because, at least during this
5  heyday of pill mill clinics, the term really lost its
6  negative connotation?
7      A.  No, it's more of a generic connotation.  It
8  became a generic term used for almost every pain
9  management doctor's office.
10     Q.  Really?
11     A.  It really did.
12     Q.  I can understand why you didn't include the
13 reference in your affidavit if you couch it like that,
14 but it is interesting to me that the word "pill mill"
15 would lose its negative connotation during these years
16 of 2009 through 2012.  That was your experience?
17     A.  Yes.  It's in the papers even.
18     Q.  And so when you would hear "pill mill" being
19 referenced even from a pharmacist, it didn't suggest to
20 you that the doctor or clinic was really doing anything
21 wrong at the time; it just suggested that they were
22 running a pain management clinic essentially?
23     A.  Essentially, yes.
24     Q.  Did you continue to treat with Dr. LeFrock
25 even after this May 4th, 2012 incident at Walgreens?

1  A. Yes. I'm still a patient of his today.
2  Q. So in other words, did the statement that
3  Dr. LeFrock was under criminal investigation, did that
4  statement change your working relationship with
5  Dr. LeFrock?
6  A. None whatsoever, because I knew it to be
7  untrue.
8  Q. Understood.
9  A. Just like the statement about a pill mill. He
10 doesn't run a pill mill. It's not true. Dr. LeFrock
11 is one of the most knowledgeable doctors I've ever run
12 across in my entire career.
13 Q. Did you ever do any research to determine
14 whether Dr. LeFrock was under any criminal
15 investigation at any time surrounding the year 2010,
16 2011, 2012?
17 A. No.
18 Q. So as we sit here today and at the time that
19 you authored this affidavit in June of 2012, do you
20 know for a fact whether Dr. LeFrock was ever under
21 criminal investigation?
22 A. Since I'm not a member of the police force,
23 no, I do not know for a fact if he was under criminal
24 investigation.
25 Q. It's just simply that you were not aware of

```
                                              Page 100
 1        the -- of that experience, you remember clearly
 2        reference to "pill mill"?
 3               MR. STERN:  Form.
 4               THE WITNESS:  It was brought up in the
 5          conversation.  Whether he was exactly referencing
 6          Dr. LeFrock or not, I can't really say; but it
 7          was -- it -- it was just too -- when you're
 8          getting pain medication filled, the word "pill
 9          mill" almost always comes up, whether positive or
10          negative.
11     BY MR. KLEPETKO:
12          Q.   Okay.  You testified previously about a
13        discussion with another -- with a Walgreens -- a
14        different Walgreens manager, the existence of one of
15        these lists within that manager's operation?
16          A.   He's a -- he's a manager now, so he doesn't
17        work in the pharmacy.  So it was just a simple
18        reference, "Everybody has a list," plain and simple.
19        I'm sure that the front end has a list of people that
20        they're not allowed to take checks from --
21          Q.   Okay.
22          A.   -- or do refunds for.  I mean, everybody has a
23        list.  It's just that simple.
24          Q.   And it was your clear understanding from this
25        Walgreens employee that there was a list that included
```